**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1994-17T4

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

CARL JONES, a/k/a DEAN
JONES,

    Defendant-Appellant.

_____

Submitted October 28, 2019 – Decided December 17, 2019

Before Judges Sabatino, Sumners and Natali.

On appeal from the Superior Court of New Jersey, Law Division, Passaic County, Indictment No. 17-02-0116.

Joseph E. Krakora, Public Defender, attorney for appellant (Frank M. Gennaro, Designated Counsel, on the briefs).

Camelia M. Valdes, Passaic County Prosecutor, attorney for respondent (Marc A. Festa, Senior Assistant Prosecutor, of counsel and on the briefs).

Appellant filed a pro se supplemental brief.

PER CURIAM

After a fifteen-day jury trial, defendant Carl Jones was found guilty of first-degree murder of a homeless heroin addict. Defendant was also found guilty of second-degree burglary for breaking into the victim's Jeep and selling some of its contents, and other lesser offenses. The trial court imposed a sixty-year sentence on the murder count, plus a consecutive eight-year custodial term on the burglary count.

On appeal, defendant challenges the admissibility of statements he gave to the police, the court's failure to instruct the jury as to lesser-included offenses, the admission of evidence of certain recorded telephone conversations of jail inmates, the admissibility of the medical examiner's testimony, the weight of the evidence supporting the second-degree burglary conviction, and the claimed excessiveness of his sentence.

For the reasons that follow, we affirm defendant's conviction and his sentence, except for a limited remand to correct monetary assessments that were imposed.

I.

The State's proofs adduced the following pertinent facts. The State's case was largely based upon the testimony of a co-defendant and two jail house

informants, coupled with defendant's admissions of burglary and theft during his police interrogations.

The Initial Investigation

On August 30, 2013, Paterson police officers were dispatched to an abandoned four-story brick factory building, which at one time had been the site of a brewery. On a cement patio at the rear of the building they found the body of a young man resting in a pool of blood.

An investigator from the medical examiner's office arrived on the scene, which she described as an overgrown open area that was littered with concrete blocks, drug paraphernalia, and human feces. The dead man was lying on his right side, face into the ground. The decomposition of the body indicated that he had been there for some time. There were abrasions on the man's knees and elbows, bruising under his right eye, and bruising on the inside of his upper forearm. There was also a wound on his chest that appeared to be from a rusty chain that was lying underneath his body.

An examination of the man's pockets produced a drivers license, bank card, birth certificate, state syringe access card, and Social Security card, all in the name of Timothy Linnartz. Money, car keys, and five packages of heroin were also found in Linnartz's clothing.

The police personnel on the scene concluded Linnartz probably died from a drug overdose. His body was removed and taken to the medical examiner's office.

The Autopsy

An autopsy was performed that evening by Dr. Abraham Phillip.[1] Although there was no external evidence of a skull injury, once Linnartz's scalp was pulled back a roughly circular, depressed fracture above the right eyebrow ridge became apparent. There was extensive hemorrhaging around the muscles in his neck, his right ninth rib was fractured, the right side of his liver was lacerated, and there was free blood in his abdominal cavity.

From the circular configuration of Linnartz's head wound and the force required to inflict it, the medical examiner believed that the weapon used may have been a hammer. Linnartz's neck injuries could have been caused by blunt force trauma or strangulation; his broken rib, which was the cause of the liver laceration, was likely due to a blow to the lower right chest with a heavy instrument or a kick. Morphine, a break-down product of heroin, was found in

---

[1] At the time of trial, Dr. Phillip was no longer employed by the medical examiner's office. Testimony concerning the autopsy was presented instead by Dr. Andrew Falzon, State Medical Examiner of New Jersey, based upon his independent review of Dr. Phillip's notes, reports, and photographs. We discuss the admissibility of Dr. Falzon's testimony, infra, in Part II.E.

Linnartz's blood and vitreous fluid at levels consistent with a chronic drug user and was not likely the cause of death.

Dr. Phillip concluded the cause of Linnartz's death was blunt force injuries to the head, neck and torso, and the manner of death was a homicide. The injuries were not instantly fatal and Linnartz may have lived anywhere from thirty minutes to two hours after sustaining them. Indeed, from the condition of weeds surrounding the body, it appeared that Linnartz may have lain there for some time struggling to get up. Given the state of the body's decomposition, Linnartz's time of death was estimated to be at least twenty-four hours before police arrived on the scene.

Further Investigation

On August 31, 2013, the police instituted a homicide investigation, returning to the factory to look for witnesses and other evidence. A detective from the crime scene unit retrieved a cell phone from the ground near where Linnartz's body was found but was unable to extract any fingerprints from it. The detective then entered an abandoned grain silo at the rear of the property and found an older man sleeping inside. The man, Samuel Pauling, had alcohol on his breath but was coherent and cooperative. At the back of the silo next to Pauling's sleeping area, officers found two hammers.

A-1994-17T4

Investigators observed that neither footprints nor drag marks were visible in the overgrown ground where Linnartz was found. Further, none of the trash in the area was disturbed so as to suggest that his body had been dragged.

The Discovery of the Victim's Jeep

Detectives who notified Linnartz's family of his death reported that the family had received a phone call from the Sheriff's Office on August 30, 2013, informing them that two men had been pulled over driving Linnartz's Jeep Cherokee. The men had said they were friends of Linnartz and had permission to drive the Jeep.

Investigating that claim, detectives learned the Jeep had been stopped because the driver was not wearing his seat belt. When asked for his driver's license, the driver, who said his name was Carl Jones, admitted that he did not have one. A passenger in the vehicle identified himself as Christopher Daut. Both men were friendly and non-belligerent. They claimed the Jeep belonged to a friend of theirs.

The officer who stopped the vehicle observed that the Jeep was very dirty, with garbage strewn all over. The front passenger-side window was broken and there was glass on the front seats. The ignition was being started with a screwdriver. A records check revealed the Jeep was not reported as stolen and

A-1994-17T4

that the registered owner was Linnartz.

The officer asked defendant to call Linnartz to come get the Jeep. Defendant said that Linnartz was in the Bergen County Jail, but when the officer contacted the jail he learned that Linnartz had been released. Defendant then gave the officer the phone number of Linnartz's parents, with whom the officer spoke. After this conversation, the officer had the impression that defendant had permission to use the vehicle. The Jeep was towed from the scene, and defendant and Daut were released on foot.

Detectives looked into the information that Linnartz had been held in the Bergen County Jail earlier in the week. They learned that on August 27, 2013, a patrolman in Fairfield Township had responded to a complaint about a woman panhandling in front of a market. The patrolman stopped two people leaving the scene in a Jeep. The vehicle's occupants – a man, who identified himself as Linnartz, and a woman, who identified herself as Brandi Pasquoche – looked disheveled and appeared to be homeless. Both were very thin and both had fresh needle marks on their arms. Because Linnartz and Pasquoche had multiple warrants for their arrest, the patrolman took them into custody. Pasquoche was ultimately released to the Morris County Sheriff's Department, while Linnartz remained in Bergen County.

A-1994-17T4

Linnartz was released from jail on the afternoon of August 28, 2013. At 10:54 p.m. that night the Paterson Police License Plate Reader System recorded Linnartz's Jeep parked on a dead-end street next to the factory.

On September 1, 2013, a detective went to the Morris County Correctional Facility to speak to Pasquoche and obtained photographs of defendant and Daut. The police searched for them throughout that day and found them panhandling near Route 46 that evening. They were arrested and taken to the detective bureau for interrogation.

Defendant's Statements to the Police

After waiving his Miranda[2] rights, defendant was questioned for several hours in the early morning of September 2, 2013, and again in the evening of September 3, 2013.[3] In the interrogations, which were ultimately played for the jury at trial, defendant explained to the police that he, Daut, Linnartz, and Pasquoche had been living on the second floor of the factory, in an area they called "the loft," for several months. Defendant initially explained that Pasquoche was incarcerated in Bergen or Morris County, and he had no idea

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

[3] We discuss the circumstances of defendant's interrogations in more detail in Part II, infra.

where Linnartz was. He speculated that Linnartz may have entered rehabilitation at Straight and Narrow, a treatment center located near the factory.

Defendant stated that the four of them used the factory for shelter while they got high on drugs. He had been using heroin and cocaine for several years and needed to panhandle to get money to buy drugs so he would not be "drug sick." At the time of his arrest, he was using ten bags of heroin a day. Linnartz had a very heavy heroin habit, using as much as a brick[4] of heroin daily.

Defendant said that Pasquoche made a lot of money panhandling. She usually went out with Linnartz, who drove her to panhandling locations, while defendant and Daut remained back at the loft. Pasquoche and Linnartz would leave the loft, panhandle, buy drugs, and return to get high, repeating this cycle about five times over the course of a day. The last time defendant saw Pasquoche was on the afternoon of either August 26, 2013, or August 28, 2013,[5] when she and Linnartz left the loft to panhandle. Defendant believed that they must have been arrested because there were warrants out for them. At first, he claimed that he learned of their arrests from Linnartz, who came back to the

---

[4] A "brick" of heroin consists of fifty glassine bags.

[5] The dates given by defendant were inconsistent throughout his statements and do not agree with the police records, which indicate that Pasquoche and Linnartz were arrested on August 27, 2013.

factory after being released from custody. Defendant later changed that claim, saying that he never saw Linnartz, and that he only said that he did to make it seem like he had permission to drive the Jeep.

Defendant and Daut woke up "drug sick" on the morning of August 29, 2013, because they had not had heroin since the day before. They left the loft to panhandle. They did not see Linnartz's Jeep when they walked by its usual parking spot. They first saw the Jeep around 5:00 p.m. that day when returning to the loft.

Later that night, defendant brought a hammer that he kept in the loft down to the Jeep to break the window, but decided not to do it because the police patrolled the area at night. He dropped the hammer by the fence, and later learned that Pauling, who lived in a silo behind the factory, had collected it as scrap.

According to defendant, on the morning of August 30, 2013, defendant and Daut were again "drug sick." They left the loft and noticed that the Jeep was still there. Defendant threw a rock through the Jeep's window, removed the radio and some tools, and sold them to a scrap dealer for drug money. They got about $25 for the radio, bought drugs and returned to the loft to get high.

When leaving the loft to panhandle again they saw the body, which was

10

surrounded by flies. Neither of them recognized the dead man as Linnartz. When defendant saw the body, he "freaked" and "weirded out" because he had never seen a dead body before. He did not want to get close to it.

Defendant and Daut discussed calling the police to report the body, but decided to wait until they could clear their needles and drugs out of the loft. Later that afternoon, Daut used a pay phone to call in a report of a man lying on the ground behind the factory. Shortly after Daut made the call they were pulled over for the seatbelt violation and the Jeep was towed.

Defendant claimed he must have walked past the body a few times without seeing it. He insisted that he did not recognize who it was and that he only looked at it for "half a second." He thought it was someone who had overdosed. When the detectives revealed that the dead man was Linnartz, defendant expressed disbelief. He adamantly denied killing Linnartz.

Defendant admitted, however, to getting into a fight with Linnartz "a while ago." He said that Linnartz came at him and he hit Linnartz in the chin. They did not speak for a few days, but then things got back to normal. He further admitted that he and Daut had been planning on calling the police and having Linnartz arrested on his warrants "because he was an asshole."

Defendant's statements had inconsistencies and implausibilities that were

A-1994-17T4

challenged by the detectives. For example, at first defendant could not explain how, if he had not seen Linnartz on August 28 or 29, 2013, he knew that Linnartz and Pasquoche had been arrested in Bergen County. He thereafter explained, however, that the officer who pulled him over for driving without a seatbelt gave him that information. That explanation changed when he later claimed that he and Daut went to the Paterson police complex on August 29, 2013, to ask about Pasquoche and Linnartz, and the officer at the desk said they had been arrested in Clifton.

Detectives paid particular attention to defendant's inconsistent recitation of dates and events, which, as discussed previously, was seriously confused. The only notable consistency in defendant's statements was his denial of having anything to do with Linnartz's murder.

Other Prosecution Witnesses

Margaret Linnartz

Linnartz's mother, Margaret,[6] testified that her son was twenty-nine years old when he died. He was addicted to heroin and had been in and out of rehabilitation programs several times. When sober he worked as an electrician and lived at home, but he always slipped back into addiction. She eventually

---

[6] For clarity we refer to the mother by her first name, intending no disrespect.

asked him to leave the house and told him not to return until he completed a rehabilitation program.

On August 27, 2013, Margaret received a call from the Fairfield police, informing her that Linnartz had been arrested for panhandling. She and her husband picked up his Jeep from the police station and drove it home. The Jeep was messy inside, but the windows were intact, the radio was in place, and it operated with keys.

Margaret thought that Linnartz would be transferred to the Bergen County Jail on outstanding motor vehicle warrants and was surprised to learn that he was being released on August 28, 2013. She met him at the jail around 9:30 p.m. that night. She brought him his Jeep and gave him $100. He told her that he had been accepted into Straight and Narrow, starting the next Monday. She told him to call her once he entered the program. She did not hear from him again.

Margaret recalled that at their last meeting Linnartz seemed extremely frightened. She had never seen him act so scared. He wanted to come back home, but she refused. She hoped a "tough love" approach would force him into rehabilitation.

Brandi Pasquoche

Pasquoche testified that as of the time of trial she had been sober for almost three years. In the summer of 2013, however, she was using heroin and crack cocaine daily. She was living in the factory with defendant, Daut, and Linnartz.

Pasquoche described Daut as her "common law husband" with whom she had had a relationship for almost twenty years. She had known defendant for about four years. She met Linnartz in 2011.

The four drug addicts lived in tents in the loft on the second floor of the factory. There was no electricity and no running water. Other people lived in the factory from time to time, but no one other than the four of them stayed on the second floor. An older man, Pauling, lived behind the factory. Pauling was an alcoholic who collected aluminum cans and other metal, which he would sell as scrap.

When they first moved into the loft, defendant met a man who claimed that the factory was his property. The man said he had no problem with the group staying there, however, if they secured the building. To that end he gave defendant a hammer, nails and plywood. The hammer became defendant's; only he used it; he slept with it under his pillow. Pasquoche identified a hammer that

had been recovered from Pauling's silo as the one belonging to defendant.

Pasquoche, defendant, Linnartz, and Daut were using heroin and cocaine four or five times a day. According to Pasquoche, defendant used eight to ten bags of heroin every day; Linnartz used twenty. They were always "drug sick" and irritable when they woke up in the morning.

Pasquoche explained that the group made money for drugs by panhandling. In the beginning, all four of them would go out in Linnartz's Jeep to parking lots and gas stations where there was a lot of traffic. Pasquoche would always be the one interacting with passers-by because she was better at gaining people's trust and asking for money. Having so many people in the car, however, was stressful. Eventually only Pasquoche and Linnartz went out to panhandle, while defendant and Daut waited in the loft for them to return with drugs.

Pasquoche recounted it took about an hour of panhandling for her to make $80, which she used to buy a $40 bundle of heroin and two $20 vials of crack cocaine. She typically would share the drugs with defendant and Daut when she got back to the loft. She was the one "in charge" because she made the money and she controlled the drugs. If one of the men did not listen to her, she would withhold drugs from him.

Tensions arose among the group as Pasquoche and Linnartz came to resent the fact that they were "floating" defendant and Daut. Linnartz drove the Jeep and Pasquoche begged, while defendant and Daut stayed in the loft to take care of the group's kittens. At the same time, defendant and Daut worried that Pasquoche would not return with drugs or would not share the drugs if she did come back.

According to Pasquoche, a day or two before the arrests of her and Linnartz on August 27, 2013, defendant and Linnartz got into a fight. The addicts were angry and frustrated because they could not decide who would go panhandling. They all knew that Pasquoche had an outstanding warrant for failure to pay child support and that there was a risk that she would be arrested if she went out.

As recalled by Pasquoche, Linnartz and defendant started pushing each other. Defendant punched Linnartz in the head, breaking his glasses. Linnartz did not hit back; he simply exclaimed, "What the hell is wrong with you?" Pasquoche yelled for the fight to stop. Daut backed into a corner and did not get involved. Defendant then warned Linnartz: "If you ride around with her and . . . she [gets] lock[ed] up, do not come back without her because I'm going to beat you to death and kill you."

16

After the fight, the four of them continued to live together. Pasquoche recalled defendant and Linnartz got along "for the most part."

On the afternoon of August 27, 2013, Linnartz asked to borrow defendant's cell phone so that he could call his drug dealer. Defendant gave it to him. Linnartz and Pasquoche then went to a market parking lot to panhandle. They were arrested as they tried to drive away. Linnartz was wearing his glasses at the time of his arrest. He needed them to see, and Pasquoche could not recall ever seeing him without them.

<u>Christopher Daut</u>

Daut also testified as a witness for the prosecution. Daut had entered into a plea agreement under which the State dismissed the felony murder charge pending against him, and he pled guilty to second-degree burglary and second-degree endangering an injured victim. The sentencing recommendation for the second-degree charges was fifteen years, with an eighty-five percent parole disqualifier. In exchange for testifying truthfully at defendant's trial, however, the State agreed to reduce that recommendation to six years with an eighty-five percent parole disqualifier. Daut explained that he wanted this agreement very much because he hoped to return to Pasquoche, whom he considered to be his wife.

A-1994-17T4

Daut's testimony about the circumstances and conditions of life at the loft was substantially consistent with that of Pasquoche. According to Daut, Linnartz moved into the loft in June or July 2013. Defendant complained to Daut that "a lot changed" after Linnartz moved in, and that he was getting less drugs. Defendant also complained that Linnartz and Pasquoche were leaving him out of things.

Daut described a fight between Linnartz and defendant that occurred around August 21, 2013. Linnartz was calling defendant names and taunting him. Defendant taunted back. Linnartz ran towards defendant, who punched him and knocked his glasses off. Pasquoche became hysterical and the fight stopped. Linnartz told defendant that he could never ride in the Jeep again.

According to Daut, on August 27, 2013, defendant did not want Pasquoche to go out with Linnartz. Linnartz planned to drop Pasquoche off to panhandle while he went to his parents' house to get money, but Pasquoche was afraid she would be arrested and did not want to be left alone. Defendant warned Linnartz that if he did not come back with Pasquoche, something would happen to him. Daut recalled defendant saying, "If you don't come back with Brandi I'm going to hit you with something."

As Daut described it, Linnartz and Pasquoche left around 4:30 p.m. that

day. Defendant and Daut waited in the loft for them to come back with drugs. When they did not return after four hours, defendant and Daut went out to panhandle. Later they walked to a donut shop by the police station to get something to eat from the trash bins.

Daut walked into the station to ask if Pasquoche and Linnartz had been arrested. He asked the officer to call Pasquoche's phone to see if she answered, but she did not.

Defendant and Daut woke up "drug sick" on August 28, 2013, although defendant appeared much sicker than Daut. They went to panhandle, got drugs, and went back to the loft. Defendant remained at the loft while Daut went out to panhandle and procure drugs in the afternoon.

At about 3:30 a.m. on August 29, 2013, Daut saw the Jeep pull up to the dead-end street near the factory. He then saw Linnartz come through the fence. Defendant, who also saw Linnartz, said that he wanted to talk to him and went outside to meet him. Daut followed.

Defendant walked up to Linnartz, asking him what he was doing and saying, "I don't want you on the property here no more." Linnartz refused to leave. Defendant then demanded drugs or money, but Linnartz responded that "you don't own the place" and "I'm not giving you shit." Defendant punched

Linnartz in the eye. Linnartz went down on his knee and put his hands up, asking "Why are you hitting me for?" Daut told defendant to leave Linnartz alone, but defendant hit Linnartz in the head with a hammer.

Daut identified the hammer that had been recovered from Pauling's silo, which was orange with a black handle, as the hammer with which defendant hit Linnartz. Daut did not know where defendant got the hammer. According to Daut, defendant always had the hammer with him and slept with it under his pillow. Daut had never seen anyone other than defendant use it.

When Linnartz dropped to the ground, Daut ran outside the fence to where the Jeep was parked. Defendant followed him, but he no longer had the hammer with him. Defendant said that now that they had the Jeep, they could break into it to get money for dope. Defendant threw a rock through the passenger side window and removed the radio and a tool chest from inside. Defendant and Daut went to an auto body shop, waited for it to open, and sold the radio for $25 and the tools for $10 or $15. They bought heroin and cocaine and went back to the factory to get high. They walked past Linnartz, who was lying there dead.

Later, Daut left defendant at the loft and went out to panhandle. When he returned, he and defendant returned to the Jeep and spoke to a man who gave them a device to rip out the Jeep's ignition. After using the device, they were

20

able to insert a screwdriver into the ignition and start the Jeep. They drove to Clifton, panhandled, got money, bought drugs, and returned to the loft to get high.

Daut estimated that he and defendant walked by Linnartz's body three times prior to his calling 9-1-1 on the morning of August 30, 2013. Before he made the call, however, he and defendant vacated the loft and moved to a spot near the Salvation Army where they had lived before. They took all of their belongings as well as the kittens.

On cross-examination, the defense questioned Daut about various inconsistencies in his testimony. For instance, Daut admitted that in neither of the statements he gave to the police did he say that he saw defendant kill Linnartz. Further, he admitted that he told the police that he and defendant saw Linnartz's Jeep when they returned to the loft on the evening of August 28, 2013, and that they assumed Linnartz must have checked in to Straight and Narrow.

Daut also acknowledged on cross that, in a letter that he wrote to defendant while they were incarcerated in the county jail, he claimed that the prosecutors wanted him to lie on the witness stand.

Daut agreed that the version of events that he related in his plea allocution differed from his testimony at trial—at least in the details—but he insisted he

told the truth both times. When presented with the transcript of his plea hearing, Daut admitted that he told the court that he and defendant were attempting to break into Linnartz's Jeep on August 29, 2013, when Linnartz confronted them. He said that he made a mistake when he said the confrontation happened at the Jeep, and that it really happened at the rear of the building. Daut also admitted he was incorrect when he said that defendant used the hammer to break the Jeep's window, rather than a rock. He said he was confused when he gave his plea and did not know what he was thinking. He said that when the prosecution team was preparing him for trial they pointed out the areas where he was confused and then he remembered things differently.

Bryant Castillo

Bryant Castillo also testified for the State pursuant to a cooperation agreement. Under his plea bargain, Castillo pled guilty to possession of heroin with intent to distribute. In exchange for his truthful testimony at defendant's trial, his period of parole ineligibility would be cut from three years to eighteen months. Castillo had been deported twice, and he understood the cooperation agreement did not protect him from another deportation when he was released from prison.

According to Castillo, he and defendant were housed together at the

Passaic County Jail for four or five months.  Defendant spoke to Castillo about his case several times, and Castillo took notes of what he said.

As recounted by Castillo, defendant revealed to him that he was being charged with the murder of Linnartz.  Defendant stated he and Linnartz got into an argument and were struggling in some grass near the factory.  Defendant said he hit Linnartz with "a piece of metal," which he later described as a hammer.  Linnartz covered his head with his hands and fell.  Defendant searched Linnartz and found some money and bags of heroin.  He took Linnartz's glasses because Linnartz was unable to see without them.  He did not want Linnartz to go looking for help.

Defendant told Castillo he discarded the hammer in an area of the factory where some tanks were located.  A homeless man who lived in the tanks had a cart and would go about picking up everything he could find.  Defendant knew the man would take the hammer.

Eduardo Perales

Eduardo Perales also testified for the State pursuant to a cooperation agreement.  He pled guilty to third-degree possession of a controlled dangerous substance with intent to distribute and received a five-year sentence with two-and-a-half years of parole ineligibility.  In exchange for testifying truthfully at

defendant's trial, his sentence would be reduced to three years with an eighteen-month parole disqualifier.

Perales and defendant were housed together at the Passaic County Jail from March 31, 2016, until January 5, 2017. Perales had some limited legal knowledge and would sometimes help other inmates prepare documents for court. Defendant brought Perales information about his case and wanted Perales to help him revise letters he had written, which Perales did.

Defendant frequently talked about his case with Perales. He told Perales that he, Pasquoche, Daut, and Linnartz had been living on the second floor of an abandoned factory. Defendant said he hated Pasquoche because, while they were living together, he helped her with burglaries to support her drug habit, but now she was encouraging her boyfriend, Daut, to tell the prosecutor's office that he (defendant) beat Linnartz to death. Defendant kept asking Perales if Daut could be used as a witness against him.

Knowing that Perales was about to be released on bail, defendant asked him for help. He wanted Perales to look for a hammer that was in a construction glove, thrown near the silos behind the factory. He said that the hammer might be gone because a "bum" who lived in the silos picked up metal in a shopping cart. He also asked Perales to try to find the eyeglasses he took from Linnartz.

<span>A-1994-17T4</span>

Defendant told Perales that after the fight, he took eyeglasses, money, some packs of heroin, and a syringe kit from Linnartz. The heroin was not good quality, however, so defendant used the money to buy better drugs. After his purchase, defendant remembered that he had Linnartz's eyeglasses in his pocket. He took them out and threw them toward the river. The glasses did not fall in the water, but landed in the dirt near the riverbank. Defendant told Perales was worried that if the police found the glasses, they could detect his DNA on them.

A few days before Perales made bail, defendant drew him a map showing the area where the bum lived, where the dead body was lying, where he tossed the glasses, and where he purchased drugs. On the back of the map, Perales wrote down defendant's personal information and details about the detective who arrested defendant.

Perales testified that he saw an inmate deliver a letter to defendant that was written by Daut. Perales read the letter at least five times. In it, Daut claimed the prosecutor's office wanted him to lie.

Perales explained that defendant's best friend in and out of jail was Richard Horn.[7] Defendant had asked Horn to try to get in touch with Daut, who

_____

[7] Richard Horn is sometimes referenced in the transcripts as Richard Hawn. In their briefs, defendant has adopted the appellation "Hawn," while the State uses

was housed in a different area of the jail. Perales saw defendant use the phones located in the jail to call Horn. He later provided the prosecutor's office with the telephone number defendant had given him for Horn.

Telephone Records and Recordings from The County Jail

Detectives from the Passaic County Prosecutor's Office obtained telephone records from the jail for every call made to or from the phone number provided by Perales. The records did not specifically identify which inmate made a particular call, but they did show the inmate number and the pin number associated with that inmate. Based on information contained in the records, the detectives subpoenaed audio recordings of ten telephone calls involving Horn's number. Portions of two of those calls, each lasting no more than five minutes, were played for the jury. We discuss those calls in more detail, infra, in Part II.C of this opinion.

Defendant's Proofs

Defendant elected not to testify. He presented two witnesses on his behalf, Ricky Ortiz and Commander David Stillman from the Passaic County Sheriff's Department.

_____

"Horn." Because "Horn" is the most frequent spelling in the transcripts, we use that version of the name.

Ortiz testified that he worked at General Carbon, a company located next to the abandoned factory where Linnartz's body was found. The garage door at the back of the General Carbon building opens onto the dead-end street where Linnartz normally parked his Jeep.

One day at the end of August 2013, Ortiz noticed a lot of police activity in the back yard of the abandoned factory. The day before that, Ortiz had been working near the open garage door when he saw a Jeep parked on the dead-end street and a man standing next to it who looked like he needed help. Ortiz approached the man, who said he was trying to get into the car. Ortiz assumed he was locked out. Ortiz could not remember what the man looked like, nor could he remember whether he gave him a tool to help him get inside. Ortiz returned to work, and when he went back outside about twenty minutes later, the Jeep was gone. He recalled seeing broken glass on the ground where the Jeep was parked.

Looking at various photographs, the only person Ortiz could definitively identify was Pasquoche, whom he described as someone who lived at the factory and fed cats living there.

Stillman, the records custodian at the Passaic County Jail, also testified for defendant. He identified an inmate grievance form filed by defendant on

February 25, 2017. That form, designated as D-22, was admitted into evidence in its entirety. In it, defendant claimed other inmates took his personal and legal papers following a shakedown of their living quarters in January 2017. The grievance was dismissed by the jail as untimely.

## II.

On appeal, defendant raises the following arguments:

POINT ONE

DEFENDANT'S STATEMENTS WERE NOT THE PRODUCT OF A VOLUNTARY, KNOWING, AND INTELLIGENT WAIVER OF HIS RIGHT TO REMAIN SILENT AND, THEREFORE, SHOULD HAVE BEEN SUPPRESSED BY THE TRIAL COURT.

POINT TWO

THE TRIAL COURT'S FAILURE TO INSTRUCT THE JURY AS TO THE LESSER INCLUDED OFFENSES OF AGGRAVATED MANSLAUGHTER, PASSION/PROVOCATION MANSLAUGHTER AND RECKLESS MANSLAUGHTER WAS PLAIN ERROR (Not Raised Below).

POINT THREE

THE ADMISSION OF OTHER CRIMES EVIDENCE CONSISTING OF RECORDINGS OF JAIL TELEPHONE CALLS DENIED DEFENDANT A FAIR TRIAL.

POINT FOUR

THE TRIAL COURT ERRED BY DENYING DEFENDANT'S JUDGMENT OF ACQUITTAL AND NEW TRIAL MOTIONS REGARDING THE CRIME OF SECOND-DEGREE BURGLARY.

POINT FIVE

THE TESTIMONY OF THE MEDICAL EXAMINER SHOULD HAVE BEEN STRICKEN AS AN INADMISSIBLE "NET OPINION."

POINT SIX

THE AGGREGATE SENTENCE OF 68 YEARS IN PRISON, SUBJECT TO THE NO EARLY RELEASE ACT, WAS EXCESSIVE.

Defendant adds the following points in his reply brief:

REPLY POINT ONE

DEFENDANT'S STATEMENTS WERE NOT THE PRODUCT OF A VOLUNTARY, KNOWING, AND INTELLIGENT WAIVER OF HIS RIGHT TO REMAIN SILENT AND, THEREFORE, SHOULD HAVE BEEN SUPPRESSED BY THE TRIAL COURT.

REPLY POINT TWO

THE TRIAL COURT'S FAILURE TO INSTRUCT THE JURY AS TO THE LESSER INCLUDED OFFENSES OF AGGRAVATED MANSLAUGHTER, PASSION/PROVOCATION MANSLAUGHTER AND RECKLESS MANSLAUGHTER WAS PLAIN ERROR.

Lastly, in a pro se supplemental brief, defendant makes these arguments:

SUPPLEMENTAL POINT I

THE STATEMENT ALLEGEDLY MADE BY APPELLANT SHOULD HAVE BEEN SUPPRESSED BECAUSE THE PROCEDURES UTILIZED BY LAW ENFORCEMENT OFFICERS, DURING THE CUSTODIAL INTERROGATION OF MR. JONES, FAILED TO COMPLY WITH MIRANDA V. ARIZONA, VIOLATING THE FIFTH, AND THE FOURTEENTH AMENDMENT, OF THE UNITED STATES CONSTITUTION, AND ARTICLE I, PARAGRAPH 10 OF THE NEW JERSEY CONSTITUTION.

SUPPLEMENTAL POINT II

THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN FAILING TO CHARGE THE JURY ON THE LESSER INCLUDED OFFENSES OF AGGRAVATED MANSLAUGHTER, PASSION/PROVOCATION MANSLAUGHTER AND RECKLESS MANSLAUGHTER, THIS DEPRIVED APPELLANT OF A FAIR TRIAL AND DUE PROCESS OF LAW. U.S. CONST. AMENDS. VI, XIV; N.J. CONST. ART I, PARS. I, 10.

SUPPLEMENTAL POINT III

THE DEFENDANT-PETITIONER WAS SUBJECTED TO EXTENSIVE UNDUE PREJUDICE RESULTING FROM THE INTRODUCTION OF EXCESSIVE INADMISSIBLE OTHER-CONDUCT EVIDENCE THAT SHOULD NOT HAVE BEEN ADMITTED PRIOR TO COFIELD/MARRERO TESTS, AND IF ADMITTED SHOULD HAVE BEEN

SANITIZED AND FOLLOWED BY MANDATORY
LIMITED-USE INSTRUCTIONS.

SUPPLEMENTAL POINT IV

THE TRIAL COURT ERRED IN DENYING
APPELLANT'S MOTION FOR JUDGMENT OF
ACQUITTAL, AND THE MOTION FOR A NEW
TRIAL.

SUPPLEMENTAL POINT V

THE TRIAL COURT SHOULD NOT HAVE
PERMITTED THE RECORDINGS OF THE
TELEPHONE CALLS WITHOUT FIRST
CONDUCTING A WADE HEARING TO IDENTIFY
THE VOICE RECORDINGS. (not raised below).

SUPPLEMENTAL POINT VI

THE CUMULATIVE EFFECT OF THE ERRORS
COMPLAINED OF RENDERED THE TRIAL
UNFAIR.

We have carefully considered each of these arguments in light of the record and the applicable law. For the reasons we now amplify, none of them have merit.

A.

Defendant argues that the admission of statements he made following his arrest violated the privilege against self-incrimination guaranteed by the Fifth Amendment to the United States Constitution. This issue was the subject of a

31

two-day pretrial hearing under Rule 104.

Specifically, defendant contends that even though he was suffering the effects of heroin withdrawal during questioning, the detectives did not provide him with medical treatment. He claims the detectives were utilizing his pain and discomfort to aid them in their interrogation. He asserts these circumstances resulted in a statement that "provided the State with a suspicious, disjointed scenario, the product of a mind that was 'fried' . . . to be presented to the jury." Defendant argues the denial of medical care in order to induce physical pain coerced him. The trial court rejected these contentions of involuntariness after the Rule 104 hearings. We sustain that ruling.

Sergeant Todd Pearl, who led the investigation into Linnartz's murder, testified concerning defendant's interrogations. Sergeant Pearl explained that defendant and Daut were arrested, handcuffed, transported to police headquarters, and placed in separate interview rooms. Defendant's first interrogation began about two hours later, in the early morning hours of September 2, 2013, and continued for approximately three hours. The interrogating officers were Pearl, a Lieutenant Ribeiro, and a Captain Rodriguez.

Pearl read defendant his Miranda rights from the Paterson Police Miranda form. Defendant was asked if he understood his rights, he nodded, and he wrote

"yes" on the form, indicating that he did understand. Pearl then read the waiver portion of the form aloud and asked defendant if he wished to waive his rights. Defendant wrote "yes" on the form, indicating that he wished to make a statement and to waive his right to an attorney. Pearl recalled that defendant spoke coherently at this time and gave no indication that he did not know what was going on.

During the interrogation, defendant sometimes seemed confused and complained that his brain was "screwed up" or "fried." His overall demeanor nevertheless appeared to be coherent and alert. He looked the detectives in the eye when they spoke to him and answered their questions directly.

Toward the end of the interview, Captain Rodriguez referred to defendant's heroin addiction and said: "As soon as your habit starts to kick in, as soon as that pain – you know that pain. I'm going to tell you about it. As soon as that pain starts coming in and you start fucking with that—start–he's [Daut's] fucking you." Rodriguez asked defendant how many bags of heroin he used a day, then said: "Oh, you're going to feel pain, a lot of pain. You're going to go through a lot of pain." He added that once Daut began feeling that pain, he would talk.

When the interrogation was finished, defendant was taken to the cell block

A-1994-17T4

at the Paterson Police holding facility. He remained there until his next interrogation, which occurred on the evening of September 3, 2013, and lasted about two hours. The interrogating officers at this session were Sergeant Otero, Detective Lugo, Detective Alba, and Sergeant Pearl.

Otero asked if defendant remembered his rights and still wanted to talk to them, and defendant said that he did. In general, the questioning was less heated than in the first interrogation, with the detectives doing most of the talking. Defendant appeared sick at this time. When the detectives were not in the room, he rested his head on the table and later started spitting up into a trash can. While being questioned, he rocked in the chair with his arms wrapped tightly around his chest.

Pearl testified that defendant was not examined by medical personnel prior to the interrogations. He pointed out that Otero was with him throughout the interviews and that she had extensive training as an emergency medical technician. However, he did not think she performed a physical examination on him. He was aware that defendant was a heroin addict and acknowledged that it was possible that defendant was going through withdrawal while being interrogated. Indeed, Pearl thought withdrawal was very likely by the time of the second interview. He testified that defendant never requested medical

34

treatment, never asked to be taken to the hospital, and never appeared to be in medical distress.

The trial judge found Pearl's testimony at the <u>Rule</u> 104 hearing to be credible. Based on his review of the video recordings of both interrogations, the judge found there was a clear and unambiguous manifestation of defendant's desire to waive his rights. The judge observed that defendant was a middle-aged man who could read and write English and who had a great deal of experience with the criminal justice system. The judge found the police questioning was not prolonged and did not involve physical or mental abuse.

As to defendant's argument that he was feeling sick during the interrogations, the judge stated: "I don't find that his lack of using drugs contributed, in any way, to . . . giving any statement as a result of being uncomfortable." The judge stated that it was clear that defendant might not have felt well, but no discomfort was manifested in the interviews. Accordingly, the judge concluded that defendant's statements would be admissible in the State's case in chief. The statements consequently were presented to the jury.

Our review of the trial judge's decision on admissibility of evidence is deferential. <u>State v. Hubbard</u>, 222 N.J. 249, 269 (2015) ("an appellate tribunal must defer to the factual findings of the trial court when that court has made its

findings based on the testimonial and documentary evidence presented at an evidentiary hearing or trial."). Where, as here, the evidence consists of testimony of one or more witnesses and a videotaped recording of a statement by a witness or a suspect, "an appellate court is obliged to review the entire record compiled in the trial court to determine if the factual findings are supported by substantial credible evidence in the record." Ibid.

The governing law is well established. "Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent." Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980). There is no question here that defendant's statements were taken while he was in police custody. Thus, for them to be admissible, the prosecutor was required to prove beyond a reasonable doubt that defendant's waiver was knowing, intelligent and voluntary. State v. A.M., 237 N.J. 384, 398 (2019).

"A determination of voluntariness depends on an 'evaluation of the totality of all the surrounding circumstances.'" State v. Roach, 146 N.J. 208, 227 (1996) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973)); State v. L.H., 239 N.J. 22, 42 (2019). "In the totality-of-the-circumstances analysis, we consider such factors as the defendant's 'age, education and intelligence, advice as to constitutional rights, length of detention, whether the questioning was

repeated and prolonged in nature and whether physical punishment or mental exhaustion was involved.'" State v. Nyhammer, 197 N.J. 383, 402 (2009) (quoting State v. Presha, 163 N.J. 304, 313 (2000)).

Here, there is no dispute that Miranda rights were clearly and appropriately explained to defendant, and that he expressed his desire to waive them. The question is whether the interrogations produced voluntary statements. That question has two parts: (1) whether Captain Rodriguez's alleged taunts about defendant's "pain" constituted overbearing psychological pressure; and (2) whether failing to provide defendant with medical attention and interrogating him while he was experiencing heroin withdrawal constituted physical punishment.

Courts have recognized that an involuntary confession can result from psychological as well as physical coercion. State v. Galloway, 133 N.J. 631, 654 (1993). Confessions derived from "'very substantial' psychological pressures that overbear the suspect's will" are not voluntary. Cook, 179 N.J. at 563 (quoting Galloway, 133 N.J. at 656). Nevertheless, use of a psychologically-oriented technique is not, in and of itself, inherently coercive. State v. Knight, 183 N.J. 449, 463 (2005); Galloway, 133 N.J. at 654. "The real issue is whether the person's decision to confess results from a change of mind

rather than from an overbearing of the suspect's will." Galloway, 133 N.J. at 655.

Here, Rodriguez's references to the pain that defendant would be experiencing, while arguably insensitive, did not rise to the level of overbearing psychological pressure under the applicable law. Rodriguez did not promise to do anything to alleviate defendant's pain in exchange for his cooperation. Rather, Rodriguez was suggesting that Daut would turn on defendant once the pain of withdrawal started, and that it would be in defendant's interests to be the first to talk.

Moreover, Rodriguez's questioning did not manifestly cause defendant to change his statement. The fact that Rodriguez's alleged taunts may have caused defendant emotional distress is not legally sufficient to render his statements involuntary. See, e.g., State v. Faucette, 439 N.J. Super. 241, 259-61 (App. Div. 2015) (describing an interrogator's threat to incarcerate the defendant in the same jail where a co-defendant was housed as a "psychological ploy" that did not strip the defendant of his capacity for self-determination).

Long ago in State v. Wade, 40 N.J. 27 (1963), the Supreme Court made clear that "[a] confession made by a person while under the influence of drugs is not per se involuntary." Id. at 35. Because the defendant in Wade had

received a Demerol injection an hour and a half before answering detectives' questions, the Court phrased the issue of voluntariness as whether the Demerol deprived the defendant "'of a rational intellect and a free will.'" Ibid. (quoting Blackburn v. Alabama, 361 U.S. 199, 208 (1960)). Despite medical testimony that the defendant was almost certainly under the influence of Demerol at the time of questioning, the trial court credited the testimony of the interrogators who stated that the defendant appeared normal and spoke coherently. Id. at 36. The Court affirmed, finding that the State had carried the burden of proving that the defendant's will had not been overborne. Ibid.

Similarly, in State v. Warmbrun, 277 N.J. Super. 51, 61-64 (App. Div. 1999), this court rejected the defendant's argument that he was too intoxicated to have voluntarily waived his Miranda rights. In so doing, it concluded that there was substantial credible evidence in the record to support the trial court's finding that although the defendant was very intoxicated, "he was capable of communicating and that he was responsive to answering questions and could answer correctly questions such as his name, age, etc." Id. at 64.

Although in a slightly different context, the United States Supreme Court has held that "a defendant's mental condition, by itself and apart from its relation to official coercion, should never dispose of the inquiry into constitutional

A-1994-17T4

'voluntariness.'" <u>Colorado v. Connelly</u>, 479 U.S. 157, 164 (1986). In <u>Connelly</u>, the defendant, who suffered from chronic schizophrenia, moved to suppress his confession because he claimed that the "voice of God" had compelled him to confess. <u>Id.</u> at 161. The Court rejected that argument, finding there needed to be some link between coercive activity on the part of the State and the resulting confession. <u>Id.</u> at 165-66, 170. The Court held that "[t]he voluntariness of a waiver of [the Fifth Amendment] privilege has always depended on the absence of police overreaching, not on 'free choice' in any broader sense of the word." <u>Id.</u> at 170.

The reasoning of <u>Wade</u>, <u>Warmbrun</u>, and <u>Connelly</u> is consistent with the trial court's conclusion that defendant's statements to the police were voluntary. While defendant was possibly experiencing heroin withdrawal during the first interrogation and likely was having those symptoms during the second, he never requested medical treatment. He said he was sick only once, at the end of the second interview, when asked why he reacted badly to a photograph of Linnartz's body. Shortly thereafter, questioning stopped. Throughout the interrogations, defendant spoke coherently, answered questions fully, and even verbally sparred with the detectives.

When asked by police about inconsistencies in his statements, it is true

A-1994-17T4

that defendant said his brain was "fried" and that he was confused. Nevertheless, he was alert to his surroundings, and after being informed that the dead body was that of Linnartz, he realized that he was being questioned about the murder and understood the gravity of the situation. At no point did he manifest a lack of a rational intellect or free will.

Because being under the influence of drugs does not render a statement per se involuntary, the demeanor of defendant and the content of his responses supports the trial court's finding that he was capable of knowingly, intelligently, and voluntarily answering waiving his Miranda rights and answering the detectives' questions. The finding was largely based on the court's credibility determinations, to which we owe deference. We therefore affirm the trial court's ruling.

## B.

Defendant argues that the court erred in not charging the jury as to aggravated manslaughter, passion/provocation manslaughter, and manslaughter as lesser-included offenses to homicide. He admits that his defense counsel requested that lesser-included offenses not be charged but claims that the court's failure to issue those charges, sua sponte, was plain error. He contends that the states of mind required to support such lesser-included jury charges were

41

established by evidence of Linnartz's habit of saying things that angered people, defendant's chronic dope sickness, and defendant's conduct in telling Castillo that he and Linnartz were struggling with one another. We are not persuaded by these contentions of error.

At the initial charge conference, defense counsel requested that the court charge lesser-included offenses for the burglary and theft offenses. Regarding murder and felony murder, defense counsel stated the lesser included charges conceivably would be aggravated manslaughter or manslaughter, but that he and defendant would have to decide whether to request those charges. Counsel stated that he believed that any decision in that regard prior to the close of the evidence was premature.

At a second charge conference, the court again asked defense counsel for his position on the lesser included offenses. Defense counsel replied that defendant "does not want lesser includeds on the homicide included in the jury charge, or on the jury verdict sheet." The prosecutor acknowledged that the court must charge any lesser-included offenses that apply but argued that none applied and requested that none be given.

The next day, defendant was personally questioned by defense counsel and the court out of the jury's presence. Defendant testified that he had spoken

A-1994-17T4

with defense counsel about the lesser-included offenses of aggravated manslaughter and manslaughter. They had "strategic discussions" and reviewed the advantages and disadvantages to lesser included offenses. After giving it thought, defendant told the court he did not want to charge the jury with lesser-included offenses to murder. He said that he reached that decision freely and voluntarily.

Later, at the close of defendant's case, the court read a portion of the proposed jury charge to counsel, explaining what lesser-included offenses were and how they would be applied to the burglary and theft charges. Counsel had no objections.

Accordingly, the court charged the jury as to burglary and theft and included an instruction as to those lesser-included offenses. It charged the jury as to felony murder and murder but did not include an instruction as to lesser included offenses. Counsel took no exceptions to the charge.

It is well established that "[t]rial errors which were induced, encouraged or acquiesced in or consented to by defense counsel ordinarily are not a basis for reversal on appeal." State v. Harper, 128 N.J. Super. 270, 277 (App. Div. 1974). "The defendant cannot beseech and request the trial court to take a course of action, and upon adoption by the court, take his chance on the outcome of the

trial, and if unfavorable, then condemn the very procedure he sought and urged, claiming it to be error and prejudicial."  Ibid.  (quoting State v. Pontery, 19 N.J. 457, 471 (1955)).  See also State v. A.R., 213 N.J. 542, 561 (2013) (similarly applying the doctrine of "invited error").  In order to warrant a reversal when the claimed error was invited by defense counsel, "a defendant must show that the error was so egregious as to cut mortally into his substantive rights."  State v. Ramseur, 106 N.J. 123, 282 (1987) (internal quotations omitted).

When determining whether a court erred in failing to issue an included offense charge, the first consideration is whether the charge would have satisfied the definition of an included offense that is set forth in N.J.S.A. 2C:1-8(d).[8] State v. Thomas, 187 N.J. 119, 130-31 (2006).  That initial requirement is met

---

[8]  N.J.S.A. 2C:1-8(d) provides that an offense is "included" when:

> (1) It is established by proof of the same or less than all the facts required to establish the commission of the offense charged; or
>
> (2) It consists of an attempt or conspiracy to commit the offense charged or to commit an offense otherwise included therein; or
>
> (3) It differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person, property or public interest or a lesser kind of culpability suffices to establish its commission.

here. The offenses of aggravated manslaughter, N.J.S.A. 2C:11-4(a)(1), and manslaughter, N.J.S.A. 2C:11-4(b)(1), conceptually are lesser-included offenses to murder, N.J.S.A. 2C:11-3(a)(1) and (2). See, e.g., State v. Jenkins, 178 N.J. 347, 360-61 (2004); State v. Purnell, 126 N.J. 518, 540 (1992); State v. Ramsey, 415 N.J. Super. 257, 263-64 (App. Div. 2010).

The next consideration is whether such a jury charge was requested by the State, the defense, or neither. Thomas, 187 N.J. at 131-32. Here, no one requested a lesser-included offense instruction on the murder charge.

"An unrequested charge on a lesser included offense must be given only where the facts in evidence clearly indicate the appropriateness of that charge." State v. Savage, 172 N.J. 374, 397 (2002) (emphasis added) (internal quotations omitted); accord State v. Walker, 203 N.J. 73, 86 (2010). Simply stated, "a trial court has no duty to instruct the jury sua sponte on an included offense charge if the evidence does not clearly indicate or warrant such a charge." Thomas, 187 N.J. at 132 (internal quotations omitted). The court is not required to scour the statutes to determine if there are some uncharged offenses of which the defendant may be guilty. Savage, 172 N.J. at 397.

If a lesser-included charge is clearly indicated by the evidence, however, the court has a "supervening responsibility" to issue it, even if it is contrary to

defendant's trial strategy. State v. Taylor, 350 N.J. Super. 20, 38 (App. Div. 2002) (internal quotations omitted). The critical question here, then, is whether there was evidence in the record that "clearly indicated" the appropriateness of the manslaughter charges. We conclude the record lacks such requisite proof.

Defendant was charged with first-degree murder, N.J.S.A. 2C:11-3(a)(1) and (2), for "purposely" or "knowingly" causing the death of Linnartz, or inflicting "serious bodily injury resulting in death" upon him.

In Jenkins, 178 N.J. at 361-64, the Court distinguished the elements of "SBI" (Serious Bodily Injury) murder, N.J.S.A. 2C:11-3(a), from those of manslaughter, N.J.S.A. 2C:11-4. The Court explained:

> To be guilty of SBI murder, the defendant must have knowingly or purposely inflicted serious bodily injury with actual knowledge that the injury created a substantial risk of death and that it was "highly probable" that death would result.

The Court continued:

> In aggravated manslaughter, by contrast, the defendant must have caused death with an "awareness and conscious disregard of the probability of death."

Lastly:

> If, instead, the defendant disregarded only a "possibility" of death, the result is reckless manslaughter.

A-1994-17T4

[178 N.J. at 363 (citing State v. Breakiron, 108 N.J. 591, 605 (1987); State v. Pearson, 318 N.J. Super. 123, 136 (App. Div. 1999)).]

The primary evidence against defendant came from several fact witnesses: (1) Pasquoche, who testified that defendant had threatened to kill Linnartz if he returned to the loft without her; (2) Daut, who testified that he witnessed defendant confront Linnartz and hit him in the head with a hammer; and (3) Castillo, who testified that defendant told him that he hit Linnartz in the head with a hammer during a struggle. There was also circumstantial evidence from: (4) Margaret Linnartz, who testified that her son was afraid to return to the loft after he was released from jail on August 28, 2013; (5) Pasquoche and Daut, who identified the hammer found in the silo as belonging to defendant; (6) Perales, who testified that defendant drew him a map showing where to find the hammer and Linnartz's eyeglasses; and (7) the officer who stopped defendant for a seatbelt violation, who testified that defendant phoned Linnartz's parents to prove he had permission to drive the Jeep rather than phoning Linnartz himself.

This evidence cumulatively supports a conviction for murder under N.J.S.A. 2C:11-3(a) (1) or (2), because it bespeaks of defendant's purposeful or knowing plan to cause death or serious bodily injury to Linnartz. However, it

does not "clearly" support a manslaughter conviction under either N.J.S.A. 2C:11-4(a) or (b).

Aggravated manslaughter requires that "[t]he actor recklessly causes death under circumstances manifesting extreme indifference to human life." N.J.S.A. 2C:11-4(a)(1).[9] Nothing in the evidence, however, suggests that defendant's behavior was reckless. Either he purposely initiated the confrontation with Linnartz and hit him in the head with a hammer, or he did not. There is no evidence that defendant simply disregarded the probability that hitting Linnartz with the hammer would kill him. Jenkins, 178 N.J. at 363.

Likewise, non-aggravated manslaughter requires that the homicide be committed recklessly or be committed in the heat of passion resulting from a reasonable provocation. N.J.S.A. 2C:11-4(b)(1) and (2). Again, there was no evidence of recklessness and although Linnartz was described as argumentative, there is no evidence of provocation on Linnartz's part before the confrontation. Although Castillo testified that defendant told him that defendant and Linnartz had been struggling, Castillo did not say anything about who started the fight. According to the evidence, the only person wielding a weapon was defendant.

---

[9] N.J.S.A. 2C:11-4(a)(2) involves causing a death while eluding law enforcement and is not relevant here.

A-1994-17T4

In sum, neither side requested the lesser-included jury instructions on the murder charge. The court had no independent duty to issue them if the evidence did not clearly indicate that such charges were appropriate. Thomas, 187 N.J. at 132. Because the evidence did not support a conviction under either N.J.S.A. 2C:11-4(a) or (b), the court's failure to issue such jury charges, sua sponte, was not plain error.

C.

Defendant contends he is entitled to a new trial because the trial court admitted into evidence, over his objection, two recordings of telephone calls placed to and from inmates at the Passaic County jail while the charges against defendant were pending. Defendant was a party to one of those taped conversations.[10] The other conversation involved defendant, but he did not participate in it.

The first call took place on December 20, 2016, at 11:56 a.m. While the voices are not specifically identified, Voice 1 is apparently Jeff Kemp, a friend of Horn's who was housed with Daut, Voice 2 is apparently Horn, and Voice 3 is apparently Daut.

---

[10] In his brief on appeal, defendant erroneously states that both recordings were between him and Richard Horn.

In this conversation, Horn asks Daut, "You're not talking are you?" to which Daut replies, "No." Horn then says, "No, just write the kid, man. Because he's flipping, man. He's losing his composure, bro. . . . And he loves you, bro, like a brother, man." Daut denies cooperating, while Horn promises to get him whatever he needs for trial. When Daut says he does not know what is going on and "they're going to try to have me sign some, or what . . . ," Horn warns "you can't sign . . . that's going to implicate him." Horn tells Daut to rely on Kemp because "that's my dude. You know, stay white type shit, you know." Horn closes the call by again pleading, "Please write him, though, man, please." Daut promises that he will.

The next call played for the jury took place on the same day, December 20, 2016, at 12:39 p.m. Voice 1 is apparently defendant and Voice 2 is apparently Horn.

In the conversation, Horn tells defendant that he spoke to Daut and told him to write to defendant right away. Defendant worries that Daut is a problem and will testify against him, but Horn insists that Daut is not cooperating. The following exchange then takes place:

> Voice 1: He can't cop out without me. It's impossible. Unless he's testifying.
>
> Voice 2: I - - I understand that. I told him that. I said,

<span>A-1994-17T4</span>

"You can't do nothing without him."  So, he said, "I know."  He said, "But, this is what they offered me."  Then, he says, you know, "I'm signed to it."

Voice 1:  He signed it?

Voice 2:  And, I said, "No.  Don't sign."  No, he didn't.  And I said, "When you go back, don't sign."

Voice 1:  He's going to . . . he made a story about me.  There's no ifs, no ands, no buts.  There's no way around it.

Voice 2:  So, I mean, I don't want to make it worse, want my dude to get at him?  Or, what do I do?

Voice 1:  I don't know what to do, bro.

The following context is pertinent to the court's admission of these two recordings.  During cross-examination at trial by defense counsel, Daut testified that he wrote defendant a letter in which he stated that the prosecutors wanted him to lie on the stand.  Perales corroborated Daut's testimony, saying that defendant showed him the letter and in it, Daut wrote that the prosecutor's office wanted him to lie. The State initially sought to admit the telephone recordings to show the circumstances under which Daut wrote that letter.

Defendant objected to the admission of the telephone recordings, arguing they were irrelevant and served no purpose except for "making [defendant] look bad."  The court listened to the audio recordings of the phone conversations and

overruled defendant's objections. First, it found that evidence of the existence of Daut's letter was admissible. It also found that the jail's call logs fell under the business records exception to the rule against hearsay. See N.J.R.E. 803(c)(6).

As to the substance of the recorded conversations themselves, the court found a logical connection between the State's proffer and facts at issue concerning Daut's letter. Among other things, the court found the recordings showing discussions about Daut's cooperation with the State were relevant to a material issue in dispute. In particular, the conversations were deemed relevant to explain a possible reason for the variance between Daut's testimony at trial and his testimony at his plea allocution. In addition, the court found that the evidence of the conduct on the calls was clear and convincing, and that the probative value of the calls outweighed any prejudice arising from unpleasant language on the calls.

As part of its ruling, the court also tracked elements of State v. Cofield, 127 N.J. 328 (1992), concerning the admissibility of "other bad acts" evidence under N.J.R.E. 404(b). The court presumably did so because defense counsel had invoked Rule 404(b) in his objection. After applying the Cofield factors, the

court agreed with the State that they were also admissible evidence of defendant's consciousness of guilt.

Our scope of review of the court's evidential ruling is limited. In general, we defer to a trial court's rulings on the admissibility of evidence unless the appellant demonstrates the court abused its discretion or made a "clear error of judgment." State v. J.A.C., 210 N.J. 281, 295 (2012); State v. Brown, 170 N.J. 138, 147 (2001). Defendant fails to make such a demonstration.

We agree with the trial court the recordings were relevant proof to counter the defense's efforts to show Daut had made false accusations about defendant in his dealings with the prosecution. The recordings tend to show attempts were made, or at least discussed, with Horn's assistance, to dissuade Daut from cooperating with the State. Those efforts could explain why Daut's testimony at defendant's trial was at variance in some respects with his plea colloquy testimony, at which he had more pointedly inculpated defendant. The activities and discussions may well have caused Daut to have misgivings about his cooperation. The probative value of this relevant proof was not substantially outweighed by undue prejudice. See N.J.R.E. 403.

To a lesser degree, we also agree that the second recording (i.e., the one in which defendant is one of the speakers) was relevant evidence for the State

of defendant's alleged consciousness of guilt.  We recognize that at one point during the call defendant expressed a worry that Daut had "made a story" about him, and did not explicitly state that he had taken part in the killing.  Even so, that only signifies the second call is open to competing interpretations, which were for the jury to assess.

We also reject defendant's argument that the trial court provided the jurors with an inadequate instruction about the evidential use of the recordings.  The court expressly cautioned the jury that it could "not use this evidence to decide that [he] has a tendency to commit crimes, or that he is a bad person."  The court also admonished the jurors that if they found defendant had taken part in phone calls from the jail, they could not infer "he must be guilty of the present crimes." This instruction is consistent with the "anti-propensity" prohibition of N.J.R.E. 404.

Notably, neither party at trial objected to the court's issuance of the instruction, or its sufficiency.  Because of that lack of objection, defendant must now establish plain error that is "clearly capable of producing an unjust result." Afanador, 151 N.J. 41, 54 (1997); see R. 2:10-2.  Defendant fails to demonstrate such plain error.

A-1994-17T4

Defendant complains for the first time on appeal that the trial court should have specified a particular use or uses of the recordings as "other bad acts" evidence. However, the recordings were not necessarily used as proof of "other bad acts" by defendant, but instead counterproof by the State to explain why Daut's trial testimony had varied from his plea colloquy. Moreover, even if the evidence is analyzed strictly as <u>Rule</u> 404(b) evidence, we are not persuaded the omission of further specification in the court's instruction was clearly capable of producing an unjust verdict. No plain error occurred.

D.

Defendant further challenges the sufficiency of the State's evidence to support his conviction of the count charging him with second-degree burglary. He raised this argument unsuccessfully before the trial court three times: first, through a motion for judgment of acquittal at the close of the State's case-in-chief; second, with a similar motion for acquittal at the close of all evidence, and, third, with a post-verdict motion for a new trial.

The trial court soundly rejected each of these motions. Viewing the record, as the court must, <u>see</u> <u>State v. Reyes</u>, 50 N.J. 454, 459 (1967), in a light most favorable to the State, there was ample evidence for the jury to find beyond

a reasonable doubt that defendant committed second-degree burglary in violation of N.J.S.A. 2C:18-2(b).

A person is guilty of burglary if, with purpose to commit an offense therein he enters a structure without license or privilege to do so. N.J.S.A. 2C:18-2(a)(1).

> Burglary is a crime of the second degree if in the course of committing the offense, the actor:
>
> (1) Purposely, knowingly or recklessly inflicts, attempts to inflict or threatens to inflict bodily injury on anyone; or
>
> (2) Is armed with or displays what appear to be explosives or a deadly weapon.
>
> [N.J.S.A. 2C:18-2(b).]

The evidence reasonably supported the jury's finding of guilt under this statute. First, there was Daut's testimony at the plea allocution hearing, which was described during his cross-examination and read into the record during redirect. The parties dispute whether Daut actually testified at his plea allocution that Linnartz was killed after Daut and defendant attempted to break into his Jeep or whether that fact was merely implied by the inartful questioning of his then-counsel. Either way, the jury was presented with a scenario that reasonably could be interpreted as defendant attempting to enter the Jeep using

the hammer, when he then turned and wielded it against Linnartz.

The fact that such a plausible scenario was inconsistent with Daut's direct examination testimony at trial did not prevent the jury from adopting it during deliberations. The trial court appropriately instructed the jury pursuant to <u>Model Jury Charge (Criminal)</u>, "Prior Contradictory Statement of Witnesses (Not Defendant)" (1994), that

> [e]vidence, including a witness's statement or testimony prior to trial, showing that a prior time a witness has said something which is inconsistent with the witness's testimony at the trial may be considered by you for the purpose of judging the witness's credibility. It may also be considered by you as substantive evidence, that is, proof of the truth of what is stated in the prior inconsistent contradictory statement.

An instruction under this model charge is warranted in cases such as this one, where prior inconsistent statements are relied upon as substantive evidence. <u>State v. Hammond</u>, 338 N.J. Super. 330, 339-40 (App. Div. 2001). Thus, the jury could have properly relied on Daut's plea allocution testimony in finding defendant guilty of second-degree burglary.

Moreover, there was sufficient evidence to prove the elements of second-degree burglary even if the jury disregarded Daut's plea allocution testimony. During his police interrogations, defendant offered an account of the burglary

in which he admitted going to the Jeep with his hammer to break the window. Although he claimed that he abandoned the attempt and left his hammer by the fence, there were grounds for the jury to disbelieve him. Indeed, Pasquoche and Daut both testified that defendant never went anywhere without his hammer, and that he slept with it under his pillow.

The timing of defendant's entry into the Jeep was never established during the interrogations, but, according to Daut, defendant went to the Jeep immediately after striking Linnartz with the hammer. The jury could have reasonably believed that defendant used the hammer to break into the vehicle at that time. If he did, the hammer could be considered a "deadly weapon" as contemplated by N.J.S.A. 2C:18-2(b).

A deadly weapon is defined in the Criminal Code as

> any firearm or other weapon, <u>device, instrument</u>, material or substance, whether animate or inanimate, which in the manner it is <u>used or is intended to be used</u>, is known to be capable of producing death or serious bodily injury or which in the manner it is fashioned would lead the victim reasonably to believe it to be <u>capable of producing death or serious bodily injury</u>.

[N.J.S.A. 2C:11-1(c) (emphasis added).]

The definition can include devices or instruments other than firearms, provided (1) they are capable of causing death or serious bodily injury, and (2) are used

or intended to be so used, "or are so fashioned to lead the victim of a crime to believe they can be so used." State v. Riley, 306 N.J. Super. 141, 147 (App. Div. 1997).

The jury could have reasonably concluded that defendant had immediate access to the hammer and intended to use it in a way capable of producing serious bodily injury. According to Daut's trial testimony, immediately after striking Linnartz in the head with the hammer defendant ran through the fence and to the Jeep. Perales, meanwhile, testified that defendant took Linnartz's eyeglasses, which suggested that defendant thought Linnartz might be able to get up to follow him.

Viewed in the light most favorable to the State, the evidence showed that while breaking into the Jeep, defendant was armed with a hammer – which he had just used to inflict serious bodily injury on Linnartz and which he intended to so use again if Linnartz tried to stop him from entering the Jeep. Under the circumstances, the hammer qualified as a "deadly weapon" as defined in N.J.S.A. 2C:11-1(c).

In a related argument, defendant contends his conviction for second-degree burglary must be set aside because it allegedly is inconsistent with the jury's finding that he was not guilty of felony murder. We disagree. It is well-

established under case law that inconsistent verdicts may be tolerated, so long as the evidence was sufficient to establish guilt on the counts of an indictment for which the defendant was convicted. State v. Goodwin, 224 N.J. 102, 116 (2016); State v. Banko, 182 N.J. 44, 53 (2004). Such evidential sufficiency is present here.

E.

We reject defendant's argument that the trial court was required to exclude the trial testimony of Dr. Falzon, the medical examiner who succeeded Dr. Phillip in this case.

The trial court reasonably found that Dr. Falzon's independent findings were sufficiently based upon his own personal knowledge. See State v. Bass, 224 N.J. 285, 318-19 (2016) (recognizing a qualified forensic pathologist may testify as an expert when serving as an independent reviewer of an autopsy performed by a different coroner). Dr. Falzon had access to reports, notes, photos, radiographs, and laboratory tests sufficient to enable him to reach his own independent opinions about manner of the victim's death.

We also concur with the trial court that Dr. Falzon's testimony was not inadmissible "net opinion." The expert sufficiently expressed the "whys and wherefores" underlying his conclusions, in compliance with case law. See, e.g.,

60

Townsend v. Pierre, 221 N.J. 36, 55 (2015); Davis v. Brickman Landscaping, Ltd., 219 N.J. 395, 410 (2014). For example, Dr. Falzon explained the body's state of decomposition, the appearance of the skull, how the brow ridge deformed the impact impression, the results of blood testing, why the level of morphine in the abdominal blood was artificially high, and how the broken rib lacerated the liver. He supported this testimony with autopsy photographs, clinical notes, and laboratory testing. This is the sort of evidence upon which experts in the field of forensic pathology typically rely.

Dr. Falzon did not speculate and did not express an opinion personal to himself. When questioned on cross-examination, he was able to articulate the grounds for his conclusions. His testimony was clearly not excludable net opinion.

Lastly, we reject defendant's claim that he is entitled to a new trial because Dr. Falzon did not explicitly couch his opinions as being rendered within a "reasonable degree of medical certainty." Defendant did not interpose any objection to the omission of this phraseology in the expert's testimony. Moreover, the "reasonable degree" language is not "talismanic" or "magical words" that must be uttered by every expert. Eckert v. Rumsey Park Assocs., 294 N.J. Super. 46, 51 (App. Div. 1996). Here, Dr. Falzon expressed reasonable

61

confidence in his conclusions, and his omission of the stock phrase was harmless under the circumstances.

F.

Defendant contends his aggregate sixty-eight-year sentence is excessive. In particular, he complains that the trial court found aggravating factor one, N.J.S.A. 2C:44-1(a)(1), applicable. He also challenges the imposition of a consecutive sentence on the burglary count. These arguments are unavailing.

Aggravating factor one was reasonably found in this case because the killing of the victim – who was bludgeoned and then left dying behind a factory building in the dark of night – was "especially heinous, cruel, or depraved." N.J.S.A. 2C:44-1(a)(1). The other aggravating factors identified by the court were also appropriate, particularly given defendant's extensive prior criminal record. Moreover, the consecutive sentence imposed for the burglary offense was justified under State v. Yarbough, 100 N.J. 627 (1985).

We are satisfied that defendant's sentence, while lengthy, does not "shock our conscience" or represent a manifest abuse of the trial court's discretion. State v. Fuentes, 217 N.J. 57, 70 (2014); State v. Roth, 95 N.J. 334, 364-65 (1984). We will not disturb it.

Finally, we remand solely to correct the monetary assessment imposed on defendant. At sentencing, the trial court initially imposed the following fines on the second-degree burglary charge: a $50 VCCB (Victims of Crime Compensation Board) Assessment; $75 for the Safe Neighborhood Services Fund; and $30 for the Law Enforcement Officers Training and Equipment Fund. In response to a question from the prosecution, the court changed the VCCB assessment to $100. On November 16, 2017, the court filed a judgment of conviction which reflected the sentencing proceedings, except that it imposed a $50 VCCB assessment on the second-degree burglary charge, the colloquy at sentencing notwithstanding.

The court's imposition of a $100 VCCB fine for the second-degree burglary charge is consistent with N.J.S.A. 2C:43-3.1, which states "any person convicted of a crime of violence . . . shall be assessed at least $100.00." (emphasis added). While "crime of violence" is not a well-defined term under New Jersey law, see, e.g., Cannel, New Jersey Criminal Code Annotated, comment 3 on N.J.S.A. 2C:43-3.1 (2018), second-degree burglary requires a threat of physical harm to person or property or the use of a deadly weapon. N.J.S.A. 2C:18-2(b). Moreover, the underlying facts justifying the conviction,

as discussed infra, can clearly support the imposition of the increased penalty for a crime of violence.

Regardless, "[i]n the event of a discrepancy between the court's oral pronouncement of sentence and the sentence described in the judgment of conviction, the sentencing transcript controls and a corrective judgment is to be entered." State v. Abril, 444 N.J. Super. 553, 564 (App. Div. 2016). Accordingly, the matter is remanded so that the court can either conform the judgment of conviction to the oral pronouncement of sentence or otherwise clarify the amount of assessment that is being imposed.

## H.

The balance of defendant's remaining points, including his claim of cumulative error, lack sufficient merit to warrant discussion in this opinion. R. 2:11-3(e)(2).

Affirmed in part and remanded in part to correct the sentence.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION